BENJAMIN K. LUNCH, State Bar No. 246015
NEYHART, ANDERSON, FLYNN & GROSBOLL
369 Pine Street, Suite 800
San Francisco, CA 94104
Tel. (415) 677-9440
Fax (415) 677-9445
Email: blunch@neyhartlaw.com

Attorneys for Petitioner
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 6

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

(San Francisco Division)

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 6, <br><br> Petitioner, <br><br> vs. <br><br> SHIMMICK CONSTRUCTION COMPANY, INC., a California Corporation, <br><br> Respondent. | Case No. **CV 11 5111** <br><br> **PETITION TO CONFIRM ARBITRATION AWARD** |

NEYHART,
ANDERSON,
FLYNN &
GROSBOLL
ATTORNEYS AT LAW

-1-

## PETITION TO CONFIRM ARBITRATION AWARD

Petitioner INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 6 ("IBEW Local 6") avers as follows:

### JURISDICTION & VENUE

1.       Jurisdiction is proper in this Court pursuant to 29 U.S.C. § 185(a), which grants district courts original jurisdiction over suits for violations of a contract between an employer and a labor organization in an industry affecting commerce, without respect to the amount in controversy or the citizenship of the parties. *See, e.g., Kemner v. District Council of Painting & Allied Trades* (9th Cir. 1985) 768 F.2d 1115, 1118 ("A suit to vacate or enforce compliance with an arbitration award can be founded on section 301 of the LMRA.")

2.       Venue is proper in this Court pursuant to 29 U.S.C. § 185(a), as (1) the collective bargaining agreement was entered into and is performed in this district; (2) IBEW Local 6 maintains an office in this district; (3) Respondent SHIMMICK CONSTRUCTION ("Shimmick") does business in this district; (4) the arbitration award was issued in this district; and (5) the acts and omissions giving rise to this action took place in this district.

### PARTIES

3.       Petitioner IBEW Local 6 is a labor organization within the meaning of 29 U.S.C. §§ 142(3), 152(5) and 185(a).  IBEW Local 6 is the exclusive collective bargaining representative for certain electricians and other construction industry employees employed by Shimmick.

4.       Respondent Shimmick is an employer within the meaning of 29 U.S.C. § 142(3), 152(2) and 185(a).  Shimmick is an employer in the construction industry, which is an industry affecting commerce.  Shimmick does business in San Francisco, California and surrounding areas. Shimmick is believed to be a California corporation, doing business in California with corporate

NEYHART,
ANDERSON,
FLYNN &
GROSBOLL
ATTORNEYS AT LAW

-2-

number C1658601.

## AGREEMENT TO ARBITRATE & ARBITRATION AWARD

5.      IBEW Local 6 and Shimmick are parties to a collective bargaining agreement ("CBA"), effective from June 1, 2010 to May 31, 2014.  A true and correct copy of the CBA is attached hereto as Exhibit A.  At all times mentioned in this Petition, the CBA has been in effect and binding upon IBEW Local 6 and Shimmick.

6.      The CBA specifies that any disputes between IBEW Local 6 and an employer (such as Shimmick) are to be resolved via the contractual grievance procedure.  The grievance procedure provides that if the employer's representative and the union's representative are unable to resolve a dispute, it shall be referred to a joint Labor-Management Committee ("LMC").  The membership of the LMC consists of an equal number of representatives of IBEW Local 6 and the San Francisco Electrical Contractors Association ("SFECA").

7.      The LMC votes on all grievances which come before it.  A majority vote by the LMC provides a final and binding resolution of any grievance before it.  If the LMC does not reach a majority vote, but rather deadlocks, the grievance shall be referred to a neutral arbitrator.

8.      At all times relevant, IBEW Local 6 has operated a hiring hall which refers applicants for employment with signatory employers.  On or about June 18, 2010, Shimmick requested the referral of an applicant for employment from the IBEW Local 6 hiring hall.  IBEW Local 6 member David McCarroll was dispatched in response to Shimmick's request.

9.      On or about June 21, 2010 Shimmick hired Mr. McCarroll, and he began working under the auspices of the CBA.  After being hired by Shimmick, Mr. McCarroll was required to work outside of IBEW Local 6's jurisdiction.  The CBA requires that employees who are dispatched from the IBEW Local 6 hiring hall receive IBEW Local 6 wages and fringe benefit

NEYHART,
ANDERSON,
FLYNN &
GROSBOLL
ATTORNEYS AT LAW

-3-

**PETITION TO CONFIRM ARBITRATION AWARD**
**Case No.**

contributions as well as pay for travel time.

10.    When Mr. McCarroll worked outside of IBEW Local 6's jurisdiction, Shimmick did not pay him at Local 6 rates (or for travel time), but rather paid him at the rate of the IBEW Local(s) in whose jurisdiction he was working.

11.    On or about February 28, 2011, IBEW Local 6 filed a grievance regarding Shimmick's failure to pay Mr. McCarroll in accordance with the CBA.  A true and correct copy of the grievance is attached hereto as Exhibit B.

12.    IBEW Local 6 and Shimmick were unable to resolve the grievance, which was referred to the LMC as a consequence.  The LMC held a meeting on the grievance on May 24, 2011.  Shimmick had been made aware of the LMC meeting, and was represented by Mark Thomas.  Mr. Thomas presented Shimmick's position at the meeting.  A true and correct copy of the minutes from the LMC meeting are attached hereto as Exhibit C.

13.    The LMC unanimously concluded that Mr. McCarroll had not been paid in accordance with the CBA, and directed IBEW Local 6 Assistant Business Manager Tim Donovan to calculate the precise amount owed to Mr. McCarroll. On or about August 9, 2011, the LMC issued its decision and award, which directed Shimmick to pay Mr. McCarroll $37,115.15.  A true and correct copy of the LMC decision and award is attached hereto as Exhibit D.

14.    To date, Shimmick has failed and refused to comply with the LMC's award.  Shimmick's failure to comply with the award violates the CBA between it and IBEW Local 6.  IBEW Local 6 seeks an order confirming the award.

15.    Shimmick's failure and refusal to comply with the award has been in bad faith, and without justification.  Shimmick's actions warrant the imposition of attorneys fees against it. *See, e.g. Int'l Union of Petroleum & Industrial Workers v. Western Industrial Maintenance, Inc.* (9th

NEYHART,
ANDERSON,
FLYNN &
GROSBOLL
ATTORNEYS AT LAW

-4-

PETITION TO CONFIRM ARBITRATION AWARD
Case No.

Cir. 1983) 707 F.2d 425, 428-429.

## PRAYER FOR RELIEF

***WHEREFORE***, Petitioner prays for judgment, as follows:

1.     That this Court issue an order confirming the LMC award, and that judgment be entered in favor of IBEW Local 6 and against Shimmick;

2.     An award of prejudgment interest on all sums owed by Shimmick pursuant to the arbitration award (*See, e.g. USF Reddaway, Inc v. Teamsters Union, Local 162* (D. Or. 2001) 230 F.Supp.2d 1180);

3.     That IBEW Local 6 be awarded its attorneys fees and costs on the grounds that Shimmick's refusal to comply with the award has been done without justification, and in bad faith; and,

4.     For such other and further relief as the Court may deem just and proper.

Dated: October /8, 2011                    Respectfully submitted,

NEYHART ANDERSON
FLYNN & GROSBOLL

By: _____
         Benjamin K. Lunch

Attorneys for Petitioner

NEYHART,
ANDERSON,
FLYNN &
GROSBOLL
ATTORNEYS AT LAW

-5-

EXHIBIT A





# INSIDE AGREEMENT

Between

# L O C A L   U N I O N   6
## INTERNATIONAL BROTHERHOOD OF
## ELECTRICAL WORKERS
## SAN FRANCISCO, CALIFORNIA

and

## THE SAN FRANCISCO
## ELECTRICAL CONTRACTORS
## ASSOCIATION, INC.

### June 1, 2010 - May 31, 2014



# INDEX

## to

## INSIDE AGREEMENT

                                                                    Page

AGREEMENT
BASIC PRINCIPLES — SCOPE ........................................... 1-2

ARTICLE I       EFFECTIVE DATE — CHANGES
TERMS OF THE AGREEMENT
TERMINATION — DISPUTES ............................................ 2-5

ARTICLE II      ASSOCIATION/EMPLOYER'S RIGHTS
UNION RIGHTS ............................................................. 5-10

ARTICLE III     REFERRAL PROCEDURE —
UNION SECURITY ......................................................... 11-14

ARTICLE IV      HOURS, WAGE PAYMENT, APPRENTICES,
WORKING CONDITIONS ................................................. 15-28

ARTICLE V       APPRENTICESHIP .................................... 29-33

ARTICLE VI      FRINGE BENEFITS — CONTRIBUTIONS ...... 33-43

ARTICLE VII     VARIABLE PENSION CONTRIBUTION .........43-45

ARTICLE VIII    SEPARABILITY CLAUSE......................    46

# INSIDE
# AGREEMENT

Agreement by and between the San Francisco Electrical Contractors Association, Inc., and International Brotherhood of Electrical Workers Local Union 6.

It shall apply to all firms who sign a letter of assent to be bound by this Agreement.

As used hereinafter in this Agreement, the term "Chapter" and the term "Association" shall mean the San Francisco Electrical Contractors Association, Inc. and the term "Union" shall mean Local Union 6, I.B.E.W.

The term "Employer" shall mean an individual firm who has been recognized by an assent to this Agreement.

The conditions herein shall be binding on the "Union," the "Chapter," the "Association," the "Employer" or their lessees, successors, or assigns for the full term hereof.

Each firm signatory to this Agreement shall advise Local Union 6 of the individual in their respective firms who shall be known as the "Employer." Each firm agrees to promptly notify the Union in writing of any change in individual known as the "Employer." It is not the intent of this Agreement to recognize the RME or RMO as an employee for the purposes of this Agreement.

Words used in this Agreement in the masculine gender shall include the feminine.

## BASIC PRINCIPLES

The Association and/or the Employer and the Union have a common and sympathetic interest in the Electrical Industry. Therefore, a working system and harmonious relations are necessary to improve the relationship between the Association and/or the Employer, the Union and the Public. Progress in Industry demands a mutuality of confidence between the Association and/or the Employer and the Union. All will benefit by continuous peace and by adjusting any differences by rational, common sense methods. Now, therefore, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

## SCOPE OF AGREEMENT

1
2     Electrical work as covered by this Agreement shall include the
3     handling, installing, or moving of all related materials and equipment from
4     the first point of delivery at the jobsite through the final installation, and the
5     dismantling and removing of electrical material from the jobsite, including
6     all work historically performed by employees covered by this Agreement.
7     This shall also include activation of cell systems including the core drilling,
8     welding, burning, brazing, bending, drilling and shaping of all metal
9     brackets, supports, fittings and other fabrication that are specific parts of the
10    installation of the electrical work and equipment on the jobsite.

11    Also covered under the terms of this Agreement shall be the
12    installation, maintenance, relocation and removal of all temporary wiring
13    and equipment at a jobsite for signal, light, heat or power, and running tests
14    or performance tests on any electrical installation or equipment that is part of
15    any work or jobsite.

16
17                          Article I
18            EFFECTIVE DATE — CHANGES
19            TERMS OF THE AGREEMENT
20            TERMINATION — DISPUTES

21
22    Section 1. This Agreement shall take effect June 1, 2010, and shall
23    remain in effect through May 31, 2014, unless otherwise specifically
24    provided for herein. It shall continue in effect from year to year thereafter,
25    from June 1, through May 31, of each year, unless changed or terminated in
26    the way later provided herein.

27    (a) The Agreement shall be reopened, with the exception of the
28    termination provision in Article I, which shall not be reopened, if it is
29    determined that within sixty (60) days of any wage and/or price controls that
30    the controls will deprive the Union members from receiving wages or fringe
31    benefit provisions provided in this Agreement. In such re-openings the
32    parties shall negotiate any matter not prohibited by law. Negotiations shall
33    only be on non-cost provisions of this Agreement, and insofar as the same
34    shall not be an effort to evade the law. Any change to the Agreement can
35    only be implemented if it meets the requirements of the wage and/or price
36    controls then enacted. Any disputes regarding this section or regarding the
37    definition of non-cost items shall be referred to an arbitrator as defined in
38    Article I.

2

Sec. 2. (a) Either party or an Employer withdrawing representation from the Chapter or not represented by the Chapter, desiring to change or terminate this Agreement must provide written notification at least one hundred twenty (120) days prior to the expiration date of the Agreement or any anniversary date occurring thereafter.

(b) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice.

(c) The existing provisions of the Agreement shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

(d) In the event that either party has given a timely notice of proposed changes and an agreement has not been reached by the anniversary date to renew, modify or extend this Agreement or to submit the unresolved issues to arbitration, either party may serve the other a ten (10) day written notice terminating this Agreement. The terms and conditions of this Agreement shall remain in full force and effect until the expiration of the ten (10) day period.

(e) By mutual agreement only, the parties may jointly submit the unresolved issues to arbitration for adjudication. The arbitrator's decision shall be final and binding on all parties hereto. The arbitrator shall be selected by lot from the list of arbitrators set forth in Section 8.

Sec. 3. This Agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto. Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, and the same as this Agreement.

## GRIEVANCE — DISPUTES

Sec. 4. During the term of this Agreement, there shall be no stoppage of work either by strike or lockout because of any proposed changes in this Agreement or dispute over matters relating to this Agreement. All such matters must be handled as stated herein.

However, no part of this Agreement is to be interpreted as requiring members of the Union to work behind a recognized picket line or where strike, lockout or other conditions detrimental to the interest of the Local Union prevail.

Sec. 5. There shall be a joint Labor-Management Committee (LMC) of four (4) who shall be chosen by the Union, and four (4) who shall be chosen by the Association. It shall meet regularly at such times as it may decide. It shall also meet within forty-eight (48) hours (Saturdays, Sundays

3

1   and Holidays excluded) after notice is given by either party. It shall select its
2   own Chairman and Secretary.

3   Sec. 6. Problems or disputes between the Union and the Association
4   and/or the Employer shall be referred to the Union's representative and the
5   contractor's representative within eighteen (18) calendar days from the date
6   of occurrence.  If they are unable to resolve the matter, it shall be referred to
7   the LMC.

8   Sec. 7. All matters coming before the LMC shall be decided by a
9   majority vote. Two (2) members from each of the parties hereto shall
10  constitute a quorum, but each party shall have the right to cast the full vote
11  of its membership, and it shall be counted as though all were present and
12  voting.

13  Sec. 8. Should this LMC fail to agree or to adjust any matter, such
14  shall then be referred to an arbitrator selected by lot from a list of seven (7)
15  names, obtained from the Federal Mediation and Conciliation Service.

16  If the selected arbitrator is unable or unwilling to serve, the parties
17  shall have the option of choosing another arbitrator from this list.

18  If the parties are unable to agree on selecting an arbitrator from this
19  list, the parties shall select from a second (2nd) list of seven (7) names
20  provided by the Federal Mediation and Conciliation Service.

21  His decision shall be final and binding. This arbitrator so selected
22  shall not have the authority to consider any matters other than those
23  specifically presented to him by the LMC.

24  (a) An arbitrator, when selected as provided in Section 8 shall
25  be required by the parties to agree to schedule the arbitration allowing the
26  parties sufficient time to prepare their cases, but not later than ninety (90)
27  days from the date he accepts the arbitration. The arbitrator as a condition of
28  acceptance of an arbitration case shall agree to render a decision in writing
29  within thirty (30) days following the last day of hearings or from the due
30  date of submittal of briefs.

31  (b) The fee for the Arbitrator as well as other expenses
32  connected with the formal hearing shall be borne equally by both parties.

33  (c) The time limits set forth above may be extended by mutual
34  consent by both parties.

35  Sec. 9. When any matter in dispute has been referred to conciliation or
36  arbitration for adjustment, the provisions and conditions prevailing prior to
37  the time such matter arose shall not be changed or abrogated until agreement
38  has been reached or a ruling has been made.

39  Sec. 10. If any section of this Agreement is determined to be unlawful
40  and such section requires payment of money by the Employer, any monies
41  that would have been paid had the section been determined to be lawful shall

4

continue to be paid in escrow and the parties shall meet, establish a joint escrow agreement, and endeavor to provide a lawful substitute utilizing such monies. Alternatively they shall negotiate a lawful provision that shall require approximately the same payment by the Employer. This payment may be allocated to any lawful wage or fringe benefit provision mutually agreeable. If the parties are unable to agree, the matter may be submitted to arbitration as provided in this Agreement.

## Article II

## ASSOCIATION/EMPLOYER'S RIGHTS

## UNION RIGHTS

Section 1. The Employer agrees not to work on new construction, alteration work, and/or any jobs where building trades mechanics are employed on any work covered by this Agreement or amendments thereto, and that all electrical work installed by the Employer shall be confined to minor repairs and trouble shooting that does not exceed two hours to complete, except as provided in Section (a). Working in excess of this time shall be a violation of this Agreement.

(a) The Employer may work with the tools on one (1) and two (2) family wood frame residential construction only, providing:

1. He employs no more than three (3) workmen including himself under the terms of this Agreement.

2. He employs at least one Journeyman in addition to himself.

3. He works with a Journeyman, when he works with the tools.

4. He lives up to the terms and conditions of this Agreement.

There is a prescribed penalty for violations of this section which shall not be less than an amount equal to the wages and fringes equivalent to the time he worked with the tools under other conditions and such shall be payable to the Northern California Electrical Workers Pension Trust Fund.

Sec. 2. Certain qualifications, knowledge, experience, and financial responsibility are required of everyone desiring to be an Employer in the Electrical Industry. Therefore, an Employer who contracts for electrical work is a person, firm, or corporation having these qualifications and maintaining a permanent place of business and a suitable financial status to meet payroll requirements. Such Employer must be in possession of a valid state license as an Electrical Contractor and be registered with the Electrical Inspection Division of the Department of Building Inspection doing work in accordance with applicable codes and employing at least one Journeyman regularly.

5

(a) Each Employer shall maintain on deposit with the custodian of the various fringe benefit programs (E.I.S.B., Inc.) a performance bond in an amount listed below as surety of the prompt and full payment of fringe benefit contributions. Individual Employers who fail to remit as provided herein, shall upon seventy-two (72) hours notice (except Sundays and Holidays) by certified mail given by the Union, be subject to having their employees removed until such time as compliance is effected. Bond forms shall be in language agreed to by the parties to this Agreement. An equivalent cash deposit may be made in lieu of the performance bond.

## Bonding Schedule

1. One (1) to fifty (50) Employees: $50,000.00
2. Fifty-one (51) to one hundred (100) Employees: $100,000.00
3. Over one hundred (100) employees: $100,000 plus $10,000 for each ten (10) Employees in excess of one hundred (100) employees.

(b) When the employers' fringe benefit bond is renewed it shall be renewed at the manpower level at that time.

Sec. 3. No Employer shall, directly or indirectly or by any subterfuge, sublet or contract with workmen or any person, firm, or corporation not under this Agreement, or enter into agreement with any other union for all or part of the labor services to be performed which fall within the International Brotherhood of Electrical Workers (Inside Wiremen) trade jurisdiction.

Sec. 4. The Employer agrees that he shall not dismiss or otherwise discriminate against any employee for making a complaint or giving evidence to the representative of the Union with respect to an alleged violation of any provisions of this Agreement.

Sec. 5. The Employer shall not interchange or cause to be loaned any workman under the terms of this Agreement to another Employer. Any Employer signatory to this Agreement who enters into a joint venture, or sub contract for the purpose of this Section, shall be considered as a separate Employer.

Sec. 6. For all employees covered by this Agreement, the Employer shall carry Workmen's Compensation Insurance through a reputable Company or State Fund; comply with the Federal Social Security Act, California Unemployment Insurance Act, and be a licensed electrical contractor in the State of California and be registered with the Electrical Inspection Division of the Department of Building Inspection in the City and County of San Francisco.

6

1    Sec. 7. Upon the request of the Business Manager of the Union or the
2    Secretary of the Labor-Management Committee, in writing, each individual
3    Employer shall furnish, within three (3) business days after written request,
4    the number, the complete payroll and/or employee job records, on a job or a
5    shop basis, for all employees employed under this Agreement.

6    Sec. 8. The Business Manager or his representative of the Union shall
7    be allowed access to any shop or job where workmen are employed under
8    this Agreement. Where necessary the Employer shall attempt to make
9    arrangements for access.

10   Sec. 9. The Employer agrees to identify all vehicles used primarily to
11   transport material, tools, workmen, or equipment for work, covered by this
12   Agreement. The firm name and location must be affixed on both sides of
13   each vehicle in a permanent manner, with two inch (2") legible letters
14   accepted as minimum. Removable signs will not comply with this Section.
15   Workmen shall not drive unidentified Employer vehicles.

16   Sec. 10. The Local Union is a part of the International Brotherhood of
17   Electrical Workers, and any violation or annulment by an individual
18   Employer of the approved agreement of this or any other Local Union of the
19   IBEW, other than violations of Paragraph 2 of this Section, will be sufficient
20   cause for the cancellation of his Agreement by the Local Union after a
21   finding has been made by the International President of the Union that such
22   a violation or annulment has occurred.

23   The subletting, assigning, or transfer by an individual employer of any
24   work in connection with electrical work to any person, firm or corporation
25   not recognizing the IBEW or one of its Local Unions as the collective
26   bargaining representative of his employees on any electrical work in the
27   jurisdiction of this or any other Local Union to be performed at the site of
28   the construction, alteration, painting, or repair of a building, structure or
29   other work, will be deemed a material breach of this Agreement.

30   All charges of violations of Paragraph 2 of this Section shall be
31   considered as a dispute and shall be processed in accordance with the
32   provision of this Agreement covering the procedure for the handling of
33   grievances and the final and binding resolution of disputes.

34   Sec. 11. The policy of the Union and the workmen it represents is to
35   promote the use of materials and equipment manufactured, processed, or
36   repaired under economically sound wages, hourly and working conditions
37   by their fellow members of the International Brotherhood of Electrical
38   Workers.

7

No workman shall be discriminated against for his individual decision not to work on any materials or equipment which he believes are not so manufactured or processed, or to work on any job he believes is not in the best interests of himself or the International Brotherhood of Electrical Workers or the Electrical Construction Industry.

Sec. 12. No Employer shall assign workmen under this Agreement to any electrical work or project taken over from a previous Employer who is in default as to wages or fringe benefit payments on such work or project until such default has been corrected or guaranteed by cash deposit or special bond with the E.I.S.B., Inc.

Sec. 13. The Association and/or the Employer agrees that it shall not constitute a violation of this Agreement for the Union to remove the workmen employed by an Employer who is delinquent in any wage or fringe payment due under the terms of this Agreement.

Sec. 14. "Dual Capacity": All manual electrical work shall be performed by workmen employed under the terms of the Agreement and the applicable supplements thereto, (except as provided in Article II, Section 1). No workman shall himself become a contractor for the performance of any electrical work while he is subject to employment or remains subject to employment under the terms of this Agreement and/or supplements thereto.

Employees or applicants for employment holding a license as an electrical contractor in the State of California shall inactivate their license in accordance with Division III, Chap. 9, Section 7076.5 of the Business and Professions Code before being accorded the use of referral facilities available under this Agreement.

(a) It shall be a violation of this Agreement for any workman to contract for any electrical work, unless the workman becomes signatory to a Letter of Assent and is bound by all terms and conditions contained in this Agreement.

Sec. 15. The Union agrees that if, during the life of this Agreement, it grants to any other Employer in the Electrical Contracting Industry on work covered by this Agreement, any better terms or conditions than those set forth in this Agreement, such better terms or conditions shall be made available to the Employer under this Agreement and the Union shall immediately notify the Employer of any such concession.

Sec. 16.   In order to be competitive in the market and to meet the special needs of Employers on particular jobs, the Union may provide special consideration to Employers who request such treatment and who demonstrate, to the Union's satisfaction, a specific marketing need with regard to a particular job. Any special terms, conditions, modifications or

8

1 amendments so provided by the Union, shall be implemented with regard to
2 the particular job for which they were requested. To the extent feasible
3 within time constraints, such special terms, conditions, modifications or
4 amendments shall be made available to all signatory Employers with regard
5 to the particular job in question, but shall not constitute an action subject to
6 the favored nations clause in this Agreement.

7 Sec. 17. The Employer shall not enter into an agreement, with any
8 other union, covering any work, which is covered by this Agreement.

9 This section is not intended to settle jurisdictional disputes.

10 Sec. 18. The Union understands the Employer is responsible to
11 perform the work required by the owner. The Employer shall, therefore,
12 have no restrictions except those specifically provided for in the collective
13 bargaining agreement, in planning, directing and controlling the operation of
14 all his work, in deciding the number and kind of employees to properly
15 perform the work, in hiring and laying off employees, in transferring
16 employees from job to job within the Local Union's geographical
17 jurisdiction, in determining the need and number as well as the person who
18 will act as a Foreman, in requiring employees to observe the Employer's
19 and/or owner's rules and regulations not inconsistent with this Agreement, in
20 requiring all employees to observe all safety regulations, and in discharging
21 employees for proper cause.

22 Sec. 19. In order to protect and preserve, for the employees covered
23 by this Agreement, all work heretofore performed by them, and in order to
24 prevent any device or subterfuge to avoid the protection and preservation of
25 such work, it is hereby agreed as follows: If and when the Employer shall
26 perform any work of the type covered by this Agreement, under its own
27 name or under the name of another, as a corporation, company, partnership,
28 or any other business entity, including a joint venture, wherein the
29 Employer, through its officers, directors, partners or stockholders, exercises
30 either directly or indirectly, management control or majority ownership, the
31 terms and conditions of this Agreement shall be applicable to all such work.

32 Sec. 20. Any Employer, applicant, or workman attempting to
33 circumvent or bypass the provisions of this referral procedure either in the
34 solicitation of work or offering of employment to workmen shall be in
35 violation of this Agreement.

36 Sec. 21. The Employer agrees that, if it has not previously done so, it
37 will recognize the Union as the exclusive collective bargaining agent for all
38 employees performing electrical work within the jurisdiction of the Union,
39 on all present and future job sites; if and when a majority of the Employer's
40 employees authorized the Union to represent them in collective bargaining.

9

Sec. 22. The Employer may recall a former employee, who has worked at least one year with the Employer, and who is continuously since layoff, on the Group I out-of-work list, not exceeding six (6) months; providing the employee has accepted no other work in the jurisdiction of the Local Union 6. An employee must have worked one year with the employer following his recall prior to being eligible for a second recall by the same employer.

Sec. 23. An Employer may call an employee to work as a Foreman by name provided:

(a) The employee has not quit his most recent previous employer.

(b) The Employer shall notify the Business Manager in writing of the name of the individual who is to be requested for employment as a Foreman. Upon such request, the Business Manager shall refer said Foreman provided the name appears on GROUP I.

(c) The person hired must be employed for a minimum of one thousand (1,000) hours as a working foreman or receive a lay off.

1. After one thousand (1,000) hours have been worked the employer may change the individual's foreman status to either General Foreman or Journeyman depending on job requirements.

Sec. 24. The dangers and costs that alcohol and other chemical abuses can create in the electrical contracting industry in terms of safety and productivity are significant. The parties to this agreement resolve to combat chemical abuse in any form and agree that, to be effective, programs to eliminate substance abuse and impairment should contain a strong rehabilitation component. The local parties recognize that the implementation of a drug and alcohol policy and program must be subject to all applicable federal, state and local laws and regulations. Such policies and programs must also be administered in accordance with accepted scientific principles, and must incorporate procedural safeguards to ensure fairness in application and protection of legitimate interests of privacy and confidentiality. To provide a drug-free workforce for the Electrical Construction Industry, each IBEW local union and NECA chapter shall implement an area-wide Substance Abuse Testing Policy. The policy shall include minimum standards as required by the IBEW and NECA. Should any of the required minimum standards fail to comply with federal, state, and/or local laws and regulations, they shall be modified by the local union and chapter to meet the requirements of those laws and regulations.

(a) The parties agree to meet to negotiate terms and conditions prior to implementation of the IBEW/NECA Category 1 Substance Abuse Policy.

10

Article III

REFERRAL PROCEDURE — UNION SECURITY

Section 1. (a) In the interest of maintaining an efficient system of production in the industry, providing for an orderly procedure of referral of applicants for employment, preserving the legitimate interest of the employees in their employment status within the area and of eliminating discrimination in employment because of membership or non-membership in the Union, the parties hereto agree to the following system of referral of applicants for employment.

(b) The Union shall be the sole and exclusive source of referral of applicants for employment.

(c) The Employer shall have the right to reject any applicant for employment.

(d) The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, by-laws, constitutional provisions or any other aspect or obligation of Union membership policies or requirements. All such selection and referral shall be in accord with the following procedure.

(e) The Union shall maintain a register of applicants for employment established on the basis of the Groups listed below. Each applicant for employment shall be registered in the highest priority Group for which he qualifies.

GROUP I. All applicants for employment who have four (4) or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee, <u>and</u>, who have been employed in the trade for a period of at least one (1) year in the last four (4) years in the geographical area covered by the collective bargaining agreement.

GROUP II. All applicants for employment who have four (4) or more years' experience in the trade and who have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee.

11

GROUP III. All applicants for employment who have two (2) or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market and who have been employed for at least six (6) months in the last three (3) years in the geographical area covered by the collective bargaining agreement.

GROUP IV. All applicants for employment who have worked at the trade for more than one (1) year.

(f) If the registration list is exhausted and the Union is unable to refer applicants for employment to the Employer within forty-eight (48) hours from the time of receiving the Employer's request (Saturdays, Sundays and Holidays excluded) the Employer shall be free to secure applicants without using the Referral Procedure, but such applicants, if hired, shall have the status of "temporary employees."

(g) The Employer shall notify the Business Manager promptly of the names and Social Security numbers of such "temporary employees" and shall replace such "temporary employees" as soon as registered applicants for employment are available under the Referral Procedure.

(h) "Normal construction labor market" is defined to mean the following geographical area plus the commuting distance adjacent thereto which includes the area from which the normal labor supply is secured:

CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA. The above geographical area is agreed upon by the parties to include the areas defined by the Secretary of Labor to be the appropriate prevailing wage area under the Davis-Bacon Act to which this Agreement applies.

(i) "Resident" means a person who has maintained his permanent home in the above defined geographical area for a period of not less than one (1) year or who, having had a permanent home in this area, has temporarily left with the intention of returning to this area as his permanent home.

(j) An "examination" shall include experience rating tests if such examination shall have been given prior to the date of this procedure, but from and after the date of this procedure shall include only written and/or practical examinations given by a duly constituted Construction Local Union of the I.B.E.W. Reasonable intervals of time for examinations are specified as ninety (90) days. An applicant shall be eligible for examination if he has four years' experience in the trade.

(k) The Union shall maintain an "Out-of-Work-List" which shall list the applicants within each group in chronological order of the dates they register their availability for employment.

12

1    (l) An applicant who is hired and who receives, through no fault of his
2  own, work of thirty-five (35) hours or less shall, upon re-registration, be
3  restored to his appropriate place within the Group. This may be extended to
4  ten (10) consecutive calendar days at the discretion of the Business
5  Manager.

6    (m) Employers shall advise the Business Manager of the Local Union
7  of the number of applicants needed. The Business Manager shall refer
8  applicants to the Employer by first referring applicants in GROUP I in the
9  order of their places on the Out-of-Work-List and then referring applicants
10  in the same manner successively from the Out-of-Work-List in GROUP II,
11  then GROUP III and then GROUP IV. Any applicant who is rejected by the
12  Employer shall be returned to his appropriate place within his GROUP and
13  shall be referred to other employment in accordance with the position of his
14  GROUP and his place within the GROUP.

15    (n) The only exceptions which shall be allowed in this order of
16  referral are as follows:

17    1.  When the Employer states bona fide requirements for special
18  skills and abilities in his request for applicants, the Business Manager shall
19  refer the first applicant on the register possessing the skills and abilities.

20    2.  The age ratio clause in the Agreement calls for the employment
21  of an additional employee or employees on the basis of age. Therefore, the
22  Business Manager shall refer the first applicant on the register satisfying the
23  applicable age requirements provided, however, that all names in higher
24  priority Groups, if any, shall first be exhausted before such overage
25  reference can be made.

26    (o) An applicant who is discharged for cause two times within a
27  twelve (12) month period shall be referred to the neutral member of the
28  Appeals Committee for a determination as to the applicant's continued
29  eligibility for referral. The neutral member of the Appeals Committee shall,
30  within three business days, review the qualifications of the applicant and the
31  reasons for the discharges. The neutral member of the Appeals Committee
32  may, in his or her sole discretion: (1) require the applicant to obtain further
33  training from the JATC before again being eligible for referral; (2)
34  disqualify the applicant for referral for a period of four weeks or longer
35  depending on the seriousness of the conduct and/or repetitive nature of the
36  conduct; (3) refer the applicant to an employee assistance program, if
37  available, for evaluation and recommended action; or (4) restore the
38  applicant to his/her appropriate place on the referral list.

39    (p) An Appeals Committee is hereby established composed of one
40  member appointed by the Union, one member appointed by the Association,

13

as the case may be, and a Public Member appointed by both of these members.

(q) It shall be the function of the Appeals Committee to consider any complaint of any employee or applicant for employment arising out of the administration by the Local Union of Section 1 (d) through Section 1 (o) of the Agreement. The Appeals Committee shall have the power to make a final and binding decision on any such complaint which shall be complied with by the Local Union. The Appeals Committee is authorized to issue procedural rules for the conduct of its business, but it is not authorized to add to, subtract from, or modify any of the provisions of this Agreement, and its decision shall be in accord with this Agreement.

(r) A representative of the Employer or of the Association, as the case may be, designated to the Union in writing, shall be permitted to inspect the Referral Procedure records at any time during normal business hours.

(s) A copy of the referral procedure set forth in this Agreement shall be posted on the Bulletin Board in the offices of the Local Union and in the offices of the Employers who are parties to this Agreement.

(t) Apprentices shall be hired and transferred in accordance with the apprenticeship provisions of the Agreement between parties.

Sec. 2. Any individual employee claiming a grievance by any act or conduct in effecting referrals and who contends the referral procedure is not operating in accordance with the terms of this Agreement shall have the right to file a specific written complaint with the Appeals Committee within forty-eight (48) hours (Saturdays, Sundays and Holidays excluded) after the occurrence of the event constituting the purported grievance. Failure to file a grievance in writing within the time limit above specified shall constitute a waiver and abandonment of such grievance.

Sec. 3. All employees covered by the terms of this Agreement shall be required to become and remain members of the Union as a condition of employment from and after the eighth day following the date of their employment or the effective date of this Agreement, whichever is later.

14

## Article IV
## HOURS, WAGE PAYMENT, APPRENTICES,
## WORKING CONDITIONS

Section 1. Seven (7) hours shall constitute a day's work: from 8:00 A.M. to 12:00 Noon, and from 12:30 P.M. to 3:30 P.M. five (5) days from Monday to Friday inclusive shall constitute the workweek. All work performed before or after the times specified above and on Saturdays, Sundays and the following Holidays shall be paid for at the rate of double time.

A total of two (2) hours may be worked during the hours of 6:00 A.M. to 8:00 A.M.; or 3:30 P.M. to 5:30 P.M.; or 7:00 A.M. to 8:00 A.M. and 3:30 P.M. to 4:30 P.M.; Monday through Friday, excluding Holidays, at time and one-half and all hours worked during the day must be continuous for the time and one-half rate to apply, but it shall not be mandatory to work those hours.

When so elected by the contractor, the start time of the workday in occupied buildings may be 7:30 A.M. (July 1, 2010) or 7:00 A.M. (June 1, 2011).When this is implemented all corresponding conditions shall change accordingly. Once a start time has been established on a project, the contractor may elect to change it upon five (5) business day's notification to the Local Union. All new construction or major remodel projects will remain 8:00 A.M. start.

An employee may work seven (7) hours on Saturday between 8:00 A.M. and 3:30 P.M. at time and one-half providing the employee has not worked any overtime during that week.

New Year's Day, Martin Luther King Jr. Day, President's Day, Memorial Day, Independence Day (4th of July), Friday preceding Labor Day, Labor Day, Thanksgiving Day, the day after Thanksgiving Day, the day before Christmas when it falls on Monday through Friday, and Christmas.

When any of the above Holidays fall on Sunday, the following day shall be observed in lieu thereof. No overtime shall be performed without permission of the Business Manager.

15

New Year's Day, Independence Day (4th of July), Thanksgiving Day, the day after Thanksgiving, the day before Christmas when it falls on Monday through Friday, and Christmas Day, shall be observed on their designated historical day. The other holidays shall be observed as follows:

Martin Luther King Jr. Day – Third Monday in January

President's Day - Third Monday in February

Memorial Day - Last Monday in May

Friday preceding Labor Day

Labor Day - First Monday in September

Sec. 2. Employees required to work four (4) hours or more before the beginning of regular working hours, shall be paid at the double time rate for hours worked until relieved from duty. Employees required to work less than four (4) hours before their regular starting time shall be paid at the overtime rate until starting time of their regular workday, and straight time for their regular workday. Meal periods shall not constitute relieved from duty for the application of this provision.

(a) A meal period of thirty (30) minutes shall be allowed on the Employer's time at the end of the regular workday or before the regular workday, if employees are required to work overtime in excess of two (2) hours.

(b) Employees required to work overtime past the quitting time of their regular work day, must be relieved from work for a period of at least eight (8) hours before resuming work. The start time of the following regular work day may be scheduled to begin after a relief period of at least eight (8) hours, or employees shall be paid at the double time rate upon resuming work that day.

(c) When men are required to report to a shop, offices, supply houses, tool sheds, or field headquarters, they shall not leave same earlier than 8:00 A.M. and return not later than 3:30 P.M. unless overtime rates are paid.

Sec. 3. Any workman required to report for work shall receive not less than four (4) hours pay for that calendar day. Emergency calls - minimum of (1) hour at double time rate. Time to start when called.

Workmen who are scheduled to report for work and who cannot do so shall, if possible, notify the Employer prior to 8:30 A.M.

Sec. 4. When it is necessary to work overtime on any job covered by this Agreement, men working on the job shall be given first preference. Men from other jobs shall not be brought in to work on overtime until all men on the job have been offered the opportunity to work.

16

Overtime shall be divided equally, insofar as practical, among the men working on the job where the overtime is required, except for job supervision and/or special skills or job knowledge.

(a) A meal period of thirty (30) minutes shall be allowed on the Employer's time at the end of the regular workday or before the regular workday, if employees are required to work overtime in excess of two (2) hours.

(b) Employees working overtime shall receive a lunch period of thirty (30) minutes on Employer's time every four (4) hours, i.e. Monday thru Friday 3:30/4:00 p.m. first paid meal period, 7:30/8:00 p.m. next paid meal period.

(c) The foregoing shall not apply to the first meal period on Saturdays, Sundays and Holidays.

(d) Employees required to work during any regular lunch period shall receive the established overtime rate for such lunch period and shall thereafter be allowed a reasonable opportunity to eat his lunch for thirty (30) minutes, on the Employer's time.

Sec. 5. Whenever twenty percent (20%) of the Inside Wiremen dispatched from the Group I or Group II out of work list, or currently employed by electrical contractors with 1,760 or more hours for the year become unemployed for a period of two (2) weeks, the work week shall be reduced from five (5) days to four (4) days. Foremen and General Foremen working in a supervisory capacity are exempt from this reduction.

The number of Inside Wiremen to be used as one hundred percent (100%), against which twenty percent (20%) is determined, shall be concluded as follows:

Based on reports furnished by the E.I.S.B., an "average number" of Group I Inside Wiremen working for electrical contractors in San Francisco for one calendar year, January through December, shall be agreed to by a committee composed of two (2) representatives from labor and two (2) representatives from management. Once this "average number" is agreed to, it will become the number used to represent one hundred percent (100%) effective June 1st, renewable annually.

Sec. 6. Each shop that employs two (2) or more Journeymen must designate one (1) as the full-time Foreman. Any job on which three (3) or more Journeymen are employed shall require a Job Foreman. No Foreman shall supervise more than ten (10) men.

No workman shall be allowed to act as Foreman on more than one job at a time.

17

Each shop that employs three (3) or more Cable Splicers must designate one (1) as a full time working Cable Splicer Foreman. No Cable Splicer Foreman shall supervise more than ten (10) Cable Splicers. The selection of the Journeyman who shall be the Foreman or General Foreman shall be at the discretion of the Employer. Cable Splicers Helpers shall be Journeymen.

(a) General Foremen are Journeymen who give instructions to Foremen, Job Foremen, and Journeymen on jobs that do not require a Foreman. On jobs having a General Foreman, Foremen are not to take directions or orders or accept layout of any work from anyone except the General Foreman. This does not deny the Employer or his representative the right to give directions, orders, or layout of work through the proper channels. A General Foreman shall not supervise more than eight (8) Foremen on any job or project, and a General Foreman, where one is required, shall not work with the tools or material except in cases of emergency.

(b) Foremen are Journeymen who give instructions to Journeymen on jobs that do not require a Foreman. On jobs having a Foreman, workmen are not to take directions or orders or accept the layout from anyone except the Foreman. This does not deny the Employer or his representative the right to give directions, orders or layout of work through the proper channels.

(c) The wage schedule listed below shall be the minimum wage rates which includes four percent (4%)Vacation Pay, four percent (4%) Thrift Savings and four percent (4%) shall be the Value of the Listed Holidays, effective on the dates indicated:

| | Effective June 1, 2010 per hour |
|---|---|
| Journeyman | $53.05 |
| Foreman, Shop Foreman, and Cable Splicer | $59.68 |
| General Foreman | $66.31 |

Note: See Article VI, Section 9 and Article VII,
       for Elective Deferrals By Employees.

18

## Apprentices (per hour)

| WAGE RATES | | | PENSION CONTRIBUTIONS | |
|---|---|---|---|---|
| 1st 12 months | 40% | $21.22 | 40% | $0.00 |
| 3rd 6 months | 45% | $23.87 | 45% | $3.79 |
| 4th 6 months | 50% | $26.53 | 50% | $4.21 |
| 5th 6 months | 55% | $29.18 | 55% | $4.63 |
| 6th 6 months | 60% | $31.83 | 60% | $5.05 |
| 7th 6 months | 65% | $34.48 | 65% | $5.48 |
| 8th 6 months | 70% | $37.14 | 70% | $5.90 |
| 9th 6 months | 75% | $39.79 | 75% | $6.32 |
| 10th 6 months | 80% | $42.44 | 80% | $6.73 |

Journeyman increase effective June 1, 2011, $1.75 per hour and June 1, 2012, $2.60 per hour and June 1, 2013, $3.65 per hour (this increase is based on the Journeyman classification. All other classifications to be increased on their historical percentage).

Various fringe benefit payments may be increased prior to June 1 of any year by reducing the above rates accordingly.

Sec. 7. Men laid off shall be notified of such layoff at least one (1) hour before termination of work. Men shall be paid all wages due immediately when laid off, and such wages shall include the one (1) hour pay after notification.

(a) When workmen are laid off, the Employer shall complete a termination report form as supplied and must comply with the instructions on said form.

Sec. 8. Wages shall be paid every Wednesday by the Electrical Employer by whom the workman is employed, and not more than three (3) days' wages shall be withheld. The Employer shall pay wages on the job or allow employees sufficient time to reach the shop on payday before the close of working hours. Any workman laid off or discharged by the Employer shall be paid all his wages immediately. In the event he is not paid off, waiting time at the straight time rate of pay shall be paid until payment is made. The time calculated is on a twenty-four (24) hour basis. Wages shall be paid on Tuesday when a recognized holiday falls on Wednesday and the Tuesday payday shall be the same as the normal Wednesday payday.

19

1  Payroll checks which are issued to employees and are not cashed
2  because of insufficient funds, account closed or similar problems and
3  provided the attempt to cash the check is done within two (2) weeks of
4  receiving the check, the check shall be subject to waiting time until the
5  check is cashable unless the Labor-Management Committee determines that
6  the circumstances involved were beyond the control of the Employer such as
7  a legitimate administrative error within the Employer's office.

8  (a) Employers whose principal place of business is located
9  outside the State of California and who do not have a bona fide Branch
10  office located in the State of California shall use payroll checks drawn on an
11  account located at a San Francisco Bank.

12  Sec. 9. Wages shall be paid for all time in going from the shop to the
13  job, from the job to the shop and from the job to job. Carrying tools or
14  material to or from the job is considered as working and no workman shall
15  carry tools or material outside of working hours. The Employer shall provide
16  transportation for all tools and materials.

17  Sec. 10. No workman shall use his automobile or other conveyance in
18  any manner detrimental to the best interest of the other workmen. Workmen
19  shall not be allowed to use their own automobiles or other conveyance for
20  the transportation of themselves, Employer's tools or material at any time.
21  The workman may use his own automobile or other conveyance to and from
22  the job before and after working hours in this jurisdiction.

23  Sec. 11. No workman shall drive Employer's automobile or other
24  conveyance before or after regular working hours. Workmen keeping
25  Employer's automobile or conveyance at their residence or garage shall not
26  drive same more than one (1) hour before or one (1) hour after the regular
27  workday.

28  Sec. 12. Employers' vehicles used in the on-jobsite performance of
29  work under this Agreement, shall be operated by workmen covered by this
30  Agreement.

31  Sec. 13. Every fifth man in any shop shall be fifty-five (55) years of
32  age, or older, when such men are available.

33  Sec. 14. When Employers send workmen to perform work outside the
34  jurisdiction of the Union where a different wage rate prevails, they shall be
35  paid the highest rate. When workmen are required to work in any
36  jurisdiction that does not participate in the same employee plans as set forth
37  in Article VI of this Agreement, the Employer shall comply with the
38  requirements of Article VI.

20

Sec. 15. The Employer shall furnish transportation during regular working hours to and from all jobs within the jurisdiction of the Union. On all work outside the jurisdiction of the Union, the Employer shall furnish transportation, board, room, and all other necessary expenses, including time traveling outside of regular working hours. Reasonable expense shall be allowed for overnight trips, with fifteen dollars ($15.00) per day per man for a seven (7) day week recognized as a minimum amount.

Workmen who are required to work overtime on jobs outside of this jurisdiction and who are not required to remain away overnight shall continue on the overtime rate (double time) while returning to the shop.

For the purpose of this Section, 55 Fillmore Street shall be considered as the shop location for the employers who do not maintain a shop in the City and County of San Francisco.

Travel time outside of the workday shall be at the rate of pay for that day as defined by Article 4, Section 1 of this agreement.

Sec. 16. An employer signatory to a collective bargaining agreement or to a letter of assent to an agreement with another IBEW Local Union, who signs an assent to this Agreement, may bring up to four bargaining unit employees employed in that Local Union's jurisdiction into this Local's jurisdiction and up to two bargaining unit employees per job from that Local's jurisdiction to this Local's jurisdiction for specialty or service and maintenance work. All charges of violations of this section shall be considered as a dispute and shall be processed in accordance with the provisions of this agreement for the handling of grievances with the exception that any decision of a local Labor-Management Committee that may be contrary to the intent of the parties to the National Agreement on Employee Portability, upon recommendation of either or both the appropriate IBEW International Vice President or NECA Regional Executive Director, is subject to review, modification, or rescission by the Council on Industrial Relations.

Sec. 17. No workman shall furnish stocks, dies, stilson wrenches over fourteen (14) inches long, hack saw blades, fish steel, wood bits, hickeys, rotary cutters, taps, twist drills, acetylene torch, presto tank, portable electric drills, ladders, vises, gads, star drills, special tools of any kind or special tool boxes.

21

Sec. 18. The Employer shall only be responsible for the replacement of the employee's tools lost or damaged due to fire or theft under the following terms and conditions while those tools are located within the jurisdiction of Local Union 6, except when an employee's tools are lost outside the jurisdiction of Local Union 6 when he is sent by the Employer to such location.

(a) The liability of the Employer shall be limited to the tools listed in the approved inventory form, less the first ten dollars ($10.00). This amount will be the responsibility of the employee.

(b) Each employee shall submit to the Employer or his representative a tool inventory list approved by the Labor-Management Committee and furnished by the Union.

(c) It shall be the responsibility of the Employer or his representative to verify the inventory list; failure to do so shall be an admission of liability for the listed tools in case of fire or theft.

(d) When the Employer does not provide a safe locked building, room, tool shed or vehicle for the storage of the employees' tools or when the tools are in the custody of the Employer or his representatives, the Employer shall be liable for the complete replacement of listed tools.

(e) It shall be the responsibility of the employee to use all reasonable means to preserve and protect his tools. Failure to do so will relieve the Employer of all liability. Any employee willfully making false or inaccurate claims will be in violation of this Agreement and will be dealt with by the Union.

(f) In the event of a disputed claim, both the Employer or his representative and the employee must appear before the Labor-Management Committee, whose ruling shall be binding. If the Employer requires the employee to appear before the Committee, the Employer shall pay for all hours involved.

22

(g)    Journeyman-wiremen shall provide themselves with the
following tools:

Tool Box - 20" x 8 1/2" x 9 1/2" minimum
2 Pliers, Channel Lock
Pliers, Diagonal Cutters 8"
Pliers, Side Cutters - 9" Offset with Insulated Handles
Pliers, Long Nose 8"
Wrench, Adjustable Crescent 6"
Wrench, Adjustable Crescent 10"
Wrench, Pipe - 10"
Wrench, Pipe - 14" or small Chain Tong
Hammer, Straight Claw
Screwdriver - 2 1/2" Blade, 5" Blade, 8" Blade
Wrench, Set Screw, set of eleven Allen
Chisel, Wood 1/4" Cold - 1/2"
Screwdriver, Offset 1/4"
Saw, Hack, Frame and adjustable
Saw, 3 Blade, Keyhole, Metal, Wood
Rule, 6' Wood
Punch, Center
Awl
Plumb bob-8 oz.
Square, Combination - 12"
Knife, Wire Skinning, Pocket
Level, 9" Torpedo, Magnetic
Tester, Knopp with pouch or equal
Tap Wrench, up to 1/4 - 20
Steel Tape 50'
Steel Tape 12' minimum, 25' maximum
Chalk Line
Airplane Shears - 10"
Flashlight
2 Phillips Screwdrivers, Size 1 and 2
Spin Tite Wrench Set - 1/4", 5/16", 7/16"
5" Leather Pocket Pouch
Protractor Level
Screwholder insulated
Wirestripper

23

Sec. 19. All cord drops, molding, and conduit work must be made up and prepared on the job, except on any one job two (2) pieces of conduit may be cut and threaded at the shop by the Journeyman doing said work.

(a) This section shall not apply to prelamped fixtures.

Sec. 20. Journeymen are to correct any work installed in violation of the requirements of the authority having jurisdiction, unless such work was installed as instructed by the Employer or his agent. Report of violations shall be made in writing within seventy-two (72) hours, Saturdays, Sundays and Holidays excluded to the representative of the Association and to the Union. Correction to be made only after a fair investigation, such investigation by the representative of the Association, as defined in the introduction to this Agreement, and the Business Manager of the Union shall be made not later than the first working day following the report to the Business Manager of such improper workmanship and the decision relative to each report of improper workmanship shall be made immediately upon the completion of this investigation and such investigation shall not exceed five (5) working days.

Sec. 21. All employees working on unguarded or swinging scaffolds, boatswain's chairs, working on or climbing unguarded ladders of poles or towers, or unguarded structures in heights in excess of sixty feet (60'), shall be paid time and one-half the regular rate of pay, and when working in heights in excess of ninety feet (90') shall be paid double the hourly rate of pay. The applicable rate shall be paid for a minimum of two (2) hours.

(a) When employees are required to work in any hazardous area they shall be supplied with protective clothing and equipment by the Employer. Any safety equipment or necessary protective devices shall be supplied to workmen by the Employer.

(b) All supervisory personnel shall have a current OSHA 30 certification. Foremen called by name and employees promoted to the supervisory level shall obtain an OSHA 30 certification within one hundred and eighty (180) days of hire or promotion. All Journeylevel employees shall have current OSHA 10 certification as of June 1, 2012.

Sec. 22. On all energized circuits of four hundred and forty (440) volts or over, as a safety measure, two (2) or more Journeymen of the proper classification must work together, except for testing or replacing fuses.

These provisions shall also apply to working on energized two hundred and seventy-seven (277) volt circuits.

(a) Due to the serious recognized hazards to employees and risks to facilities and equipment, IBEW/SFECA strongly supports the control and elimination of energized electrical work whenever possible. In the limited instances where work meets the criteria established in NFPA

24

1   70E, Article 130 (Justification for Work on or Near Live Parts) and OSHA
2   1910.333 (Selection and use of Work Practices) adequate safety or
3   protection devices including Fire-rated clothing (in the appropriate size)
4   shall be supplied by the Employer in accordance with the Safety Orders of
5   the Department of Industrial Relations and the CAL-OSHA Standard for
6   Electrical Safety in the workplace. Workers shall observe and comply with
7   all Employer policies and procedures in matters of Safety and will complete
8   the employer provided Energized Electrical Hot Work Form.

9       Sec. 23. Underground and Tunnel Work. All rates of pay shall be
10  increased when work is performed in any uncompleted tunnel or shaft. All
11  rates of pay for men assigned to work in such tunnels or shafts shall be
12  increased ten percent (10%). Employees on the job for five (5) hours during
13  the regular working hours shall receive a minimum of a day's pay. The
14  Employer shall furnish and be responsible for all safety equipment and
15  clothing as required by the Division of Industrial Safety or as required by
16  special conditions.

17       Sec. 24. When employees are required to work in any area that is
18  under full asbestos containment procedures and required to wear related
19  safety clothing and breathing apparatus said employees shall receive the
20  regular hourly rate plus ten percent (10%).

21       When employees are required to work less than seven continuous
22  hours they shall receive the regular rate plus ten percent (10%) per hour
23  worked, provided however no employee shall receive less than two (2) hours
24  at the regular hourly rate plus ten percent (10%).

25       Asbestos certification shall be recognized as a special skill.
26  Employees shall not be responsible for any costs associated with
27  certification or any required equipment for performing work under asbestos
28  containment.

29       Employees cannot be terminated for refusal to work in an asbestos
30  area.

31       Sec. 25. When workmen are transported by non scheduled aircraft
32  they shall be protected by a Life and Casualty Insurance Policy in the
33  amount of $50,000.00, in addition to regular Workmen's Compensation
34  coverage.

35       Sec. 26. If during the terms of this agreement, the Davis-Bacon
36  prevailing wage rate is lowered as the result of a wage survey causing the
37  lowering of such prevailing wage rate, subject to the requirements set forth
38  below, all signatory contractors shall be permitted to bid future federal
39  public works projects, not already awarded or bid, at the lower prevailing
40  wage rate. If, during the term of this agreement, the state prevailing wage
41  rate is lowered as the result of a wage survey causing the lowering of such

1   prevailing wage rate, subject to the requirements set forth below, all
2   signatory contractors shall be permitted to bid future state public works
3   projects, not already awarded or bid at the lower prevailing wage rate.
4   Before any contractor is permitted to pay less than the contractual wage rate
5   as the result of a wage survey lowering the prevailing wage rate as described
6   above, the contractor must: receive written verification from the parties to
7   this agreement that the lower advertised wage rate is the applicable wage
8   rate to be used in the bid for that project.
9

26

# SHIFT WORK

Sec. 27. When so elected by the contractor, multiple shifts of at least five (5) days' duration may be worked. When two (2) or three (3) shifts are worked:

(a) The first shift (day shift) shall be worked between the hours of 8:00 A.M. and 4:30 P.M. Workmen on the day shift shall receive eight (8) hours' pay at the regular hourly rate for eight (8) hours' work.

(b) The second shift (swing shift) shall be worked between the hours of 4:30 P.M. and 12:30 A.M. Workmen on the "swing shift" shall receive eight (8) hours' pay at the regular hourly rate plus ten percent (10%) for seven and one-half (7-1/2) hours' work.

(c) The third shift (graveyard shift) shall be worked between the hours of 12:30 A.M. and 8:00 A.M. Workmen on the "graveyard shift" shall receive eight (8) hours' pay at the regular hourly rate plus fifteen percent (15%) for seven (7) hours' work.

(d) A lunch period of thirty (30) minutes shall be allowed on each shift. All overtime work required after the completion of a regular shift shall be paid at one and one-half (1-1/2) times the "shift" hourly rate.

There shall be no pyramiding of overtime rates and double the straight-time rate shall be the maximum compensation for any hour worked.

There shall be no requirement for a day shift when either the second or third shift is worked.

Sec. 28. Employees transferred from one shift to another, unless relieved from work at least a full shift as set forth herein, before starting their new shift, shall be paid the overtime rates for the first such shift worked. However, if an employee working on the "first" or regular daylight shift is required to return to work on the "third" shift within the same twenty-four (24) hour workday period, he shall receive double time for the first such "third" shift worked. The twenty-four (24) hour period mentioned herein shall be the twenty-four (24) hour period commencing with the starting time of the day shift. No employee shall be transferred from his regular assigned shift to another shift more than once in a workweek. Except, however, he may be returned to his regular assigned shift.

(a) Shift starting time may be changed up to two (2) hours. When this is implemented all corresponding conditions shall change accordingly.

27

Sec. 29. An alternate 8-hour shift may be worked on any hours other than the first, second, or third shift listed in the Shift Work section. The shift shall be worked a minimum of five (5) days with workers receiving their regular hourly rate plus twenty five percent (25%) for hours worked. All overtime work required after the completion of this shift shall be paid at double the "shift" hourly rate. There shall be no requirement for any other shift when the alternate shift is worked.

# APPRENTICES

Sec. 30. (a) There shall be a minimum of ten (10) periods of apprenticeship. The first two (2) periods, consisting of eight hundred (800) hours each and satisfactory progress of the related classroom training shall constitute the probationary period. Successive periods will require the minimum hours OJT and satisfactory progress of related classroom training. The ten (10) periods are as follows:

| Ten Periods | OJT Hours | Related Training |
| --- | --- | --- |
| 1 | 0-800 | Satisfactory progress |
| 2 | 801-1600 | 1st Year school with satisfactory progress |
| 3 | 1601-2400 | 2nd Year 1st Semester with satisfactory progress |
| 4 | 2401-3200 | 2nd Year School with satisfactory progress |
| 5 | 3201-4000 | 3rd Year 1st Semester with satisfactory progress |
| 6 | 4001-4800 | 3rd Year School with satisfactory progress |
| 7 | 4801-5600 | 4th Year 1st Semester with satisfactory progress |
| 8 | 5601-6400 | 4th Year School with satisfactory progress |
| 9 | 6401-7200 | 5th Year 1st Semester with satisfactory progress |
| 10 | 7201-8000 | 5th Year School with satisfactory progress |

(b) For the purpose of "employer's designated supervisor", listed in Article V, Section 13, said supervisor shall be a General Foreman or Foreman. General Foreman or Foreman may assign tasks to first year apprentices only.

(c) First year apprentices shall not work on or near live voltage circuits or systems.

28

## Article V
## APPRENTICESHIP

Section 1. There shall be a local Joint Apprenticeship and Training Committee (JATC) consisting of a total of either six (6) or eight (8) members who shall also serve as trustees to the local apprenticeship and training trust. An equal number of members either three (3) or four (4) shall be appointed, in writing, by the local chapter of the National Electrical Contractors Association (NECA) and the local union of the International Brotherhood of Electrical Workers (IBEW).

The local apprenticeship standards shall be in conformance with national guideline standards and industry policies to ensure that each apprentice has satisfactorily completed the NJATC required hours and course of study. All apprenticeship standards shall be registered with the NJATC before being submitted to the appropriate registration agency.

The JATC shall be responsible for the training of apprentices, journeymen, installers, technicians, and all others (unindentured, intermediate journeymen, etc.).

Sec. 2. All JATC member appointments, reappointments and acceptance of appointments shall be in writing. Each member shall be appointed for a three (3) year term unless being appointed for a lesser period of time to complete an unexpired term. The terms shall be staggered, with one (1) term from each side expiring each year. JATC members shall complete their appointed term unless removed for cause by the party they represent or they voluntarily resign. All vacancies shall be filled immediately.

The JATC shall select from its membership, but not both from the same party, a Chairman and a Secretary who shall retain voting privileges. The JATC will maintain one (1) set of minutes for JATC committee meetings and a separate set of minutes for Trust meetings.

The JATC should meet on a monthly basis, and also upon the call of the Chairman.

Sec. 3. Any issue concerning an apprentice or an apprenticeship matter shall be referred to the JATC for its review, evaluation and resolve; as per standards and policies. If the JATC deadlocks on any issue, the matter shall be referred to the Labor-Management Committee for resolution as outlined in Article I of this agreement; except for trust fund matters, which shall be resolved as stipulated in the local trust instrument.

29

Sec. 4. There shall be only one (1) JATC and one (1) local apprenticeship and training trust. The JATC may, however, establish joint subcommittees to meet specific needs, such as residential or telecommunications apprenticeship. The JATC may also establish a subcommittee to oversee an apprenticeship program within a specified area of the jurisdiction covered by this agreement.

All subcommittee members shall be appointed, in writing, by the party they represent. A subcommittee member may or may not be a member of the JATC.

Sec. 5. The JATC may select and employ a part-time or a full-time Training Director and other support staff, as it deems necessary. In considering the qualifications, duties and responsibilities of the Training Director, the JATC should review the Training Director's Job Description provided by the NJATC. All employees of the JATC shall serve at the pleasure and discretion of the JATC.

Sec. 6. To help ensure diversity of training, provide reasonable continuous employment opportunities and comply with apprenticeship rules and regulations, the JATC, as the program sponsor, shall have full authority for issuing all job training assignments and for transferring apprentices from one employer to another. The employer shall cooperate in providing apprentices with needed work experiences. The local union referral office shall be notified, in writing, of all job training assignments. If the employer is unable to provide reasonable continuous employment for apprentices, the JATC is to be so notified.

Sec. 7. All apprentices shall enter the program through the JATC as provided for in the registered apprenticeship standards and selection procedures.

An apprentice may have their indenture canceled by the JATC at any time prior to completion as stipulated in the registered standards. Time worked and accumulated in apprenticeship shall not be considered for local union referral purposes until the apprentice has satisfied all conditions of apprenticeship. Individuals terminated from apprenticeship shall not be assigned to any job in any classification, or participate in any related training, unless they are reinstated in apprenticeship as per the standards, or they qualify through means other than apprenticeship, at sometime in the future, but no sooner than two years after their class has completed apprenticeship, and they have gained related knowledge and job skills to warrant such classification.

30

Sec. 8. The JATC shall select and indenture a sufficient number of apprentices to meet local manpower needs. The JATC is authorized to indenture the number of apprentices necessary to meet the job site ratio as per Section 12.

Sec. 9. Though the JATC cannot guarantee any number of apprentices; if a qualified employer requests an apprentice, the JATC shall make every effort to honor the request. If unable to fill the request within ten (10) working days, the JATC shall select and indenture the next available person from the active list of qualified applicants. An active list of qualified applicants shall be maintained by the JATC as per the selection procedures.

Sec. 10. To accommodate short-term needs when apprentices are unavailable, the JATC shall assign unindentured workers who meet the basic qualifications for apprenticeship. Unindentured workers shall not remain employed if apprentices become available for OJT assignment. Unindentured workers shall be used to meet job site ratios except on wage-and-hour (prevailing wage) job sites.

Before being employed, the unindentured person must sign a letter of understanding with the JATC and the employer—agreeing that they are not to accumulate more than two thousand (2,000) hours as an unindentured, that they are subject to replacement by indentured apprentices and that they are not to work on wage-and-hour (prevailing wage) job sites.

Should an unindentured worker be selected for apprenticeship, the JATC will determine, as provided for in the apprenticeship standards, if some credit for hours worked as an unindentured will be applied toward the minimum OJT hours of apprenticeship.

The JATC may elect to offer voluntary related training to unindentured; such as Math Review, English, Safety, Orientation/Awareness, Introduction to OSHA, First-Aid and CPR. Participation shall be voluntary.

Sec. 11. The employer shall contribute to the local health and welfare plans and to the National Electrical Benefit Fund (NEBF) on behalf of all apprentices and unindentured. Contributions to other benefit plans may be addressed in other sections of this agreement.

31

Sec. 12. Each job site shall be allowed a ratio of two (2) apprentices for every three (3) Journeyman Wiremen or fraction thereof as illustrated below.

| Number of Journeymen | Maximum Number of Apprentices/Unindentured |
|---|---|
| 1 to 3 | 2 |
| 4 to 6 | 4 |
| etc. | etc. |

The first person assigned to any job site shall be a Journeyman Wireman.

A job site is considered to be the physical location where employees report for their work assignments. The employer's shop (service center) is considered to be a separate, single job site. All other physical locations where workers report for work are each considered to be a single, separate job site.

Sec. 13. An apprentice is to be under the supervision of a Journeyman Wireman at all times. This does not imply that the apprentice must always be in-sight-of a Journeyman Wireman. Journeymen are not required to constantly watch the apprentice. Supervision will not be of a nature that prevents the development of responsibility and initiative. Work may be laid out by the employer's designated supervisor or journeyman based on their evaluation of the apprentice's skills and ability to perform the job tasks. Apprentices shall be permitted to perform job tasks in order to develop job skills and trade competencies. Journeymen are permitted to leave the immediate work area without being accompanied by the apprentice.

Apprentices who have satisfactorily completed the first four years of related classroom training using the NJATC curriculum and accumulated a minimum of six thousand five hundred (6,500) hours of OJT with satisfactory performance, shall be permitted to work alone on any job site and receive work assignments in the same manner as a Journeyman Wireman. An apprentice shall not be the first person assigned to a job site and apprentices shall not supervise the work of others.

Sec. 14. Upon satisfactory completion of apprenticeship, the JATC shall issue all graduating apprentices an appropriate diploma from the NJATC. The JATC shall encourage each graduating apprentice to apply for college credit through the NJATC. The JATC may also require each apprentice to acquire any electrical license required for journeymen to work in the jurisdiction covered by this agreement.

Sec. 15. The parties to this Agreement shall be bound by the Local Joint Apprenticeship and Training Trust Fund Agreement which shall conform to Section 302 of the Labor-Management Relations Act of 1947 as amended, ERISA and other applicable regulations.

The Trustees authorized under this Trust Agreement are hereby empowered to determine the reasonable value of any facilities, materials or services furnished by either party. All funds shall be handled and disbursed in accordance with the Trust Agreement.

Sec. 16. All Employers subject to the terms of this Agreement shall contribute the amount of funds specified by the parties signatory to the local apprenticeship and training trust agreement. The current rate of contribution is: one dollar and eleven and one-half cents ($1.115) cents per hour for each hour worked. This sum shall be due the Trust Fund by the same date as is their payment to the NEBF under the terms of the Restated Employees Benefit Agreement and Trust.

## Article VI
## VACATION, HOLIDAY, THRIFT SAVINGS, HEALTH & WELFARE, PENSION, N.E.B.F., N.E.I.F., E.I.S.B.

Section 1. Trust Funds and Related Entities. The Employer agrees to make the contributions required by this Agreement to the Trust Funds created by: and/or to be bound by the terms of the following Trust Agreements and any subsequent amendments thereto;

   (a) The Northern California Electrical Workers Pension Trust.
   (b) The Electrical Workers Health and Welfare Trust for San Francisco.
   (c) The San Francisco County Electrical Industry Apprenticeship and
       Training Trust.
   (d) The Electrical Industry Service Bureau, (EISB),
   (e) The National Employees Benefit Agreement (N.E.B.F.),
   (f) The National Electrical Industry Fund (N.E.I.F.),
   (g) Administrative Maintenance Fund (AMF)

Sec. 2. Due Date for Contributions.   The employer contributions to the Trust funds and entities referenced above in Section 1 shall be received by EISB by the Due Date. The Due Date shall be the tenth (10th) of the following month in which the hours were performed.

33

Contributions/payments shall be deemed delinquent in the event payment is not received on or before the fifteenth (15th) day of the month following the month for which contributions are due. For those employers reporting in the Electronic Transmittal System for the San Francisco System for the EISB Electrical Industry, the contributions/payments shall be deemed delinquent if the payment is not received on or before the twentieth (20th) day of the month following the month for which contributions are due. After balancing the additional administrative costs and efforts that would be necessary against the potential benefit of having earlier contributions made, it has been determined that the elective deferrals to the 401k plan as provided in Section 9 below shall also be due and payable at these same times. The 401k collection procedures adopted by EISB are incorporated herein by this reference.

Sec. 3. Liquidated Damages and Other Charges. If an Employer fails to make the required contributions to the Fund as specified above, the Board of Directors of EISB shall have the right to take whatever steps are necessary to secure compliance. If an Employer is in default, the Employer shall be liable for the amounts specified in the "Electrical Industry Service Bureau Collection Policies and Procedures" (known as the "Collection Policy") which is attached as Appendix A to this Agreement. Any amounts due and payable under such Collection Policy shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid. The Employer shall also be liable for attorney fees and other costs of collecting.

Sec. 4. Transmittal Reports. Employer contributions shall be paid monthly and be accompanied by a transmittal form by the dates specified in Section 2 above. EISB will furnish a pre-printed transmittal form unless the employer elects to provide its own computer printout in the exact format described in subsection (a) below. Any such form must be approved in advance by EISB. EISB will furnish electronically a pre-printed monthly worksheet to employers participating in the EISB electronic transmittal system. The following two reporting options apply:

(a) Manual Reporting: The completed transmittal form shall list the following information for each employee and shall, unless otherwise agreed to by the EISB office, be set forth in separate sequential columns as follows: (1) Social Security Number; (2) Name of Employee; (3) NEBF Class; (4) Number of Hours Worked; (5) Gross Pay; (6) Hourly Wage Rate; (7) Amount of Vacation Allowance, Value of Listed Holidays, Thrift Savings

34

Deduction; (8) Amount of Dues withheld if authorized by the employee pursuant to Dues Check off (to be implemented at a later date as determined by the bargaining parties); (9) COPE Deduction if authorized by the employee; and (10) Pension Contribution Rate, including the elective deferral 401k rate.

(b) EISB Electronic Transmittal Reporting: Employers may participate in the EISB Electronic Transmittal System. EISB shall prepare the monthly transmittal report and calculate Gross Pay from worksheets transmitted by the employer through a secure FTP process.    The employer will electronically report the information as follows:    For each employee in separate columns provided on either the pre-printed worksheet or on a sequential file using the exact format:    (1) Social Security Number; (2) Name of Employee; (3) NEBF Class; (4) Number of Hours Worked at Straight Time; Time and One Half; and Double Time; (5) Straight Time Hourly Wage Rate; (6) Amount of Vacation Allowance, Value of Listed Holidays, Thrift Savings Deduction; (7) Amount of Dues withheld if authorized by the employee pursuant to Dues Check Off (to be implemented at a later date as determined by the bargaining parties); (8) COPE Deduction if authorized by the employee; and (9) Pension Contribution Rate, including the elective deferral 401k rate.   The employer shall compare the transmittal prepared by EISB with monthly payroll records and report corrections. Upon certifying the accuracy of the report, the employer has the option to return the monthly transmittal check to EISB with a check for the amount due, or authorize payment from the employer's bank account through an Automated Clearing House (ACH) Debit.

(c) Monthly Transmittal — All Covered Employees: The monthly transmittal shall cover every employee subject to this Agreement on the payroll for all payroll weeks ending within the calendar month.

(d) Payroll Withholding & Deductions: The Employer shall make all legal payroll withholdings for income tax, social security, unemployment insurance, etc. from the total wages, including the full Vacation Allowance on a monthly basis. This would include deductions for the IBEW COPE Fund pursuant to a written authorization from such employees.

(e) Employees Sent to Work In Other Areas: When Employers send workers to perform work outside the jurisdiction of the Union where a different wage rate prevails, they shall be paid the highest rate.   When a worker is sent by an Employer to work in a jurisdiction that does not participate in the same employee benefit plans as set forth in this Article VI, the Employer shall report on the EISB Differential Transmittal Form the difference between the vacation withholding, pension contributions, and health and welfare contributions set forth in Article VI and the rates required under the Collective Bargaining Agreement of the jurisdiction in which they are working.


TERMS USED BELOW


LTD:  Long Term Disability.
DB Rate: Defined Benefit Plan Rate
RSP Rate:  Retirement Savings Plan Rate
NCEW:  The Northern California Electrical Workers.
SFEW:  The San Francisco Electrical Workers
SF-LMCC:  The San Francisco Labor Management Cooperation Committee.
NLMCC:  The NECA-IBEW National Labor Management Cooperation Committee.

Sec. 5. Amount of  Employer Contributions to Trust Funds and Entities.

The employer contribution amounts for each hour of work are:

| Electrical Workers Health and Welfare Trust | $10.88 |
|---|---|
| Health & Welfare | 10.65 |
| LTD | .23 |

Effective as of January 1, 2010, the $3.04 Retirement Savings Plan Contribution and corresponding apprentice rates was diverted to the NCEW Pension Plan as follows.

| NCEW Pension Trust | $ 8.42 |
|---|---|
| NCEW Pension Plan | 8.42 |
| SFEW Retirement Savings Plan | 0 |

Effective December 1, 2010, the Retirement Savings Plan contribution increased to $1.00 per hour, with corresponding increases to apprentice rates (below). Thus, the rates are:

| | |
|---|---|
| <u>NCEW Pension Trust</u> | <u>$ 9.42</u> |
| NCEW Pension Plan | 8.42 |
| SFEW Retirement Savings Plan | 1.00 |
| | |
| <u>Apprentice/SF-LMCC</u> | <u>$1.115</u> |
| SFEW Apprentice Trust | .765 |
| NLMCC | .010 |
| <u>SF-LMCC</u> | <u>.340</u> |

| | |
|---|---|
| EISB | .03 |
| LMCC | .09 |
| Drug Testing | .01 |
| Scholarship | .04 |
| Industry Compliance | .10 |
| Business Development | .07 |

(a)  Contributions for Apprentices:  Apprentices are entitled to the percent of contribution to the NCEW Pension Plan and the SFEW Retirement Savings Plan equal to their percentage, beginning with their second year, as follows (effective as of January 1, 2011):

| Level | DB Rate | RSP Rate | Total Rate |
|---|---|---|---|
| 40% | $0.00 | $0.00 | $0.00 |
| 45% | $3.79 | $0.45 | $4.24 |
| 50% | $4.21 | $0.50 | $4.71 |
| 55% | $4.63 | $0.55 | $5.18 |
| 60% | $5.05 | $0.60 | $5.65 |
| 65% | $5.48 | $0.65 | $6.12 |
| 70% | $5.90 | $0.70 | $6.59 |
| 75% | $6.32 | $0.75 | $7.07 |
| 80% | $6.73 | $0.80 | $7.54 |

Sec. 6.  Vacation, Holiday and Thrift  Amounts.  The Employer shall withhold fourteen and a quarter percent (14.25%) of each employee's gross weekly wage and shall deposit this amount to the individual employee's Vacation, Holiday and Thrift Savings account in the financial institution selected by the Labor-Management Committee as provided below.

37

(a) These accounts shall be referred to as Vacation Allowance, the Value of the Listed Holidays and Thrift Savings, i.e., two and a quarter percent (6.25%) for Vacation Allowance, four percent (4%) for the Value of the Listed Holidays as listed in Article IV, Section 1 and four percent (4%) for the Thrift Savings Deduction.

(b) Employees who have executed a voluntary dues deduction authorization card shall have two and a quarter percent (2.25%) of the withheld wages for the Vacation Allowance deposited by EISB into an individual Union dues account maintained by Local 6. Employees who have executed a voluntary dues deduction authorization card shall deliver said authorization to IBEW Local 6. IBEW Local 6 shall have sole responsibility for notifying EISB as to the names of employees who have executed voluntary dues deduction authorization cards and EISB may rely on communications from Local 6 in order to implement the dues deduction under this agreement. Monies deposited into an individual employee's dues account shall be applied towards dues. Monies that are applied towards an employee's dues in excess of any applicable dues shall be deposited quarterly into the member's vacation/holiday/savings account. Neither the employer, SFECA, Inc, nor EISB shall have any duty or responsibility in collecting dues from IBEW members working under this agreement, other than EISB's obligation to remit funds pursuant to this provision.

(c) This Vacation Allowance, the Value of the Listed Holidays and Thrift Savings shall be withheld from the employee's weekly pay and shall be sent on a monthly transmittal to: EISB, 720 Market Street, Suite 700, San Francisco, California 94102, together with a check payable to a financial institution selected by the Labor-Management Committee - Electrical Industry Accounts.

(d) The Vacation Allowance, Value of the Listed Holidays, and Thrift Savings Deduction must be paid to all workers who are directed by the individual Employer to work on jobs outside the jurisdiction of Local Union 6.

(e) The Union shall pay for all administrative expenses incurred in the operation of the program other than those incurred within the individual Employer's own office.

38

(f) Annual time-off for vacations for each employee subject to this Agreement shall be scheduled once each twelve (12) month period from February 1st, through January 31. The following rules shall apply in the calculation and scheduling of vacations:

(1) Unless mutually agreed otherwise by the Union Representative and the Employer Representative, all employees shall take two (2) weeks' vacation each vacation year, which shall begin on a Monday. The vacation period shall consist of two (2) workweeks of five (5) consecutive workdays each. No additional vacation time off, as such, shall be allowed because of any holiday that may fall within the vacation period.

(2) Any employee whose accumulated vacation allowance is less than ten (10) days standard pay shall be required to take one day vacation for the equivalent of each day of vacation pay on the same basis as above.

(3) Not more than twenty percent (20%) of the employees in any shop or on any job shall be granted their vacations at the same time unless agreed to by the Employer.

(4) Employees failing to meet the vacation requirements shall notify the Union in writing before December 30th of each vacation year.

(5) Time off for vacations is not accumulative from one vacation year to the next vacation year.

(6) There shall be an interval of at least three (3) months between a vacation for an employee in one vacation year and his vacation scheduled in the next vacation year.

(7) No vacation time off, as such, will be given in excess of two (2) weeks even though the vacation allowances accumulated may be in excess of two (2) weeks normal pay. On the other hand no employee shall be denied the right to two (2) weeks vacation time off when the vacation allowance accumulated is less than two (2) weeks.

Sec. 7.   Working Dues to Be Implemented at Future Date.   The Employer agrees to deduct and forward to the Financial Secretary of the Local Union upon receipt of a voluntary written authorization, working dues from the pay of each IBEW member.   The amount to be deducted shall be the amount specified in the approved Local Union Bylaws.   Such amount shall be certified to the Employer by the Local Union upon request by the Employer. This provision shall be implemented at a future date upon mutual agreement of the parties. Pending implementation of this provision, two and a quarter percent (2.25%) of the wages that is withheld from the Vacation Allowance pursuant to subsection 5(a) above shall continue to be applied

39

towards members' dues pursuant to signed voluntary dues authorization cards.

Sec. 8. COPE Fund Deductions. The Employer agrees to deduct and transmit to IBEW-COPE, five cents ($0.05) an hour from the wages of each employee who voluntarily authorizes such contributions on the forms provided for that purpose by IBEW-COPE.

Sec. 9. National Electrical Benefit Fund Contribution. It is agreed that in accordance with the Employees Benefit Agreement of the National Benefit Fund ("NEBF"), as entered into between the National Electrical Contractors Association and the International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the NEBF, the individual Employer will forward monthly to the NEBF's designated local collection agent an amount equal to three percent (3%) of the gross monthly labor payroll paid to, or accrued by, the employees in this bargaining unit, and a completed payroll report prescribed by the NEBF. The payment shall be made by check or draft and shall constitute a debt due and owing to the NEBF on the last day of each calendar month, which may be recovered by suit initiated by the NEBF or its assignee. The payment and the payroll report shall be mailed to reach the office of the appropriate local collection agent not later than fifteen (15) calendar days following the end of each calendar month.

The individual Employer hereby accepts, and agrees to be bound by, the Restated Employees Benefit Agreement and Trust, as it may be amended. The failure of an individual Employer to comply with such Agreement and Trust shall also constitute a breach of this Agreement.

Sec. 10. Employee Elective Deferrals to the SFEW Plan. On an annual basis Journeymen may elect to defer a portion of his/her hourly wage rate by dollar increments as set forth in the elective deferral classification in Article VII. The employee's election shall be in compliance with the Treasury Regulations implementing Section 401k of the Internal Revenue Code. EISB shall furnish the Salary Reduction agreement forms necessary to effect elective deferral contributions to the Plan. See Article VII of this document for more details regarding the employee elective deferrals.

40

Sec. 11 (a). NECA-IBEW National Labor-Management Fund. The parties agree to participate in the NECA-IBEW National Labor-Management Cooperation Fund, under authority of Section 6(b) of the Labor-Management Cooperation Act of 1978, 29 U.S.C. §175(a) and Section 302(c)(9) of the Labor-Management Relations Act, 29 U.S.C. §186(c)(9). The purposes of this Fund include the following:

1) to improve communication between representatives of labor and management;

2) to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organization effectiveness;

3) to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

4) to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;

5) to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and the industry;

6) to encourage and support the initiation and operation of similarly constituted local labor-management cooperation committees;

7) to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production;

8) to engage in public education and other programs to expand the economic development of the electrical construction industry;

9) to enhance the involvement of workers in making decisions that affect their working lives; and

10) to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

Sec. 11 (b). The Fund shall function in accordance with, and as provided in, its Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents. Each Employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the NLMCC, as provided in said Agreement and Declaration of Trust.

Sec. 11 (c). Each Employer shall contribute one cent ($0.01) per hour worked under this Agreement up to a maximum of 150,000 hours per year. Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day

41

of the month in which the labor was performed.   The San Francisco Electrical Contractors Association, NECA, or its designee, shall be the collection agent for this Fund.

Sec. 11 (d).  If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance. In the event the Employer is in default, the Employer shall be liable for a sum equal to fifteen percent (15%) of the delinquent payment, but not less than the sum of twenty (20) dollars, for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments.  Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid.  The Employer shall also be liable for all costs of collecting the payment together with attorneys' fees.

Sec. 11 (e).    The one cent ($0.01) per hour contribution for the National LMCC is to be paid from the Local LMCC Fund. There will be no increase in the wage/fringe package for this contribution.

Sec. 12.   Productive Electrical Payroll.    Each individual NECA Employer shall contribute an amount not to exceed one percent (1%) nor less than two tenths of one percent (.2 of 1%) of the productive electrical payroll, as determined by the local Chapter, with the following exclusions:

1) Twenty-five percent (25%) of all productive electrical payroll in excess of 75,000 man-hours paid for electrical work in any one Chapter area during any one calendar year but not exceeding 150,000 man-hours.

2) One hundred percent (100%) of all productive electrical payroll in excess of 150,000 man-hours paid for electrical work in any one Chapter area during any one calendar year.

(Productive electrical payroll is defined as the total wages [including overtime] for all hours worked by all classes of electrical labor for which a rate is established in the prevailing labor area where the business is transacted.)

Sec. 13.   Administrative Maintenance Fund.  Each Employer shall contribute three quarters of one percent (.75%) of the gross productive payroll for all employees working under this Agreement to the Administrative Maintenance Fund (AMF).  The monies are for the purpose

42

1 of administration of this collective bargaining agreement, grievance
2 handling, and all other management duties and responsibilities in this
3 Agreement. The fund is to be administered solely by the employers. The
4 AMF contribution shall be submitted with all other fringe benefits and shall
5 be bound by the Collection Policy referenced below and which is Appendix
6 A. The enforcement for delinquent payments shall be the sole responsibility
7 of the Local Chapter and not the Local Union. The Fund may not be used in
8 any manner detrimental to the Local Union or the IBEW.

Article VII
RULES FOR ELECTIVE DEFERRALS
BY EMPLOYEES TO THE SAN FRANCISCO ELECTRICAL
WORKERS RETIREMENT PLAN

Section 1. Each employee desiring to defer a portion of his/her wages to the 401k portion of the San Francisco Electrical Workers Retirement Savings Plan shall submit a salary reduction agreement to EISB, which shall act as the agent of the employer for the purposes of accepting salary reduction agreements. Salary reduction agreements will be submitted to EISB no later than December 8th (unless another date is selected by the Board of Trustees) of each year for elective deferrals to be effective January 1 of the succeeding year. Deferrals may be elected only in increments set forth in the elective deferral classifications listed below. Upon submission of a salary reduction agreement in accordance with this section, EISB shall notify employers of the deferral classification of each employee electing deferrals on or before December 18th (unless another date is selected by the Board of Trustees).

Sec. 2. Only journey level employees or above may elect to defer a portion of their wages. Each journeyman desiring to do so shall select a deferral classification as follows:

Class II------------------------------$0.00/Hr
Class III-----------------------------$1.00/Hr
Class IV-----------------------------$2.00/Hr
Class V------------------------------$3.00/Hr
Class VI-----------------------------$4.00/Hr
Class VII----------------------------$5.00/Hr

43

Effective January 1, 2011, the following deferral classifications are available:

$$\text{Class VIII} \text{---------------------------} \$6.00/Hr$$
$$\text{Class IX} \text{----------------------------} \$7.00/Hr$$

(a) Notwithstanding these contributions rates, the maximum elective deferral amount shall not exceed the maximum permitted by the Internal Revenue Code and lawful regulations.

(b) Only one (1) deferral classification may be implemented in any one year. Once an employee elects to defer a portion of his/her wages and the deferral classification to be implemented, deferrals will be honored by employers at the elected deferral classification form year to year thereafter, unless on or before December 8th, of any subsequent year, the employee notifies EISB on a form approved by EISB, that the employee elects to change his/her deferral classification or to cancel his/her Salary Reduction agreement, effective as of January 1st of the next year.

(c)   Notwithstanding an employee's election to defer a portion of his/her wages, wage percentage calculations for Vacation/Holiday/Thrift Savings shall be based upon the appropriate Class II wage, as if no elective deferrals were in effect.

(d)   Notwithstanding an employee's election to defer a portion of his/her wages, NEBF payment calculations shall be based upon the appropriate Class II wage, as if no elective deferrals were in effect.

(e) Deferral contributions shall be based on actual hours worked, and shall not be increased for actual hours worked at overtime rates. Thus, for example, Class III deferrals shall be contributed at one dollar ($1.00)/Hr. despite that such hour may be worked at time and one-half or double time.

(f) Wages and fringes, including deferral contributions, for work performed by an employee covered by his agreement outside of the jurisdiction of IBEW Local 6 shall be paid in accordance with such employee's deferral classification pursuant to this agreement.

44

Sec. 3.   401k Delinquency Procedures.

(a) In accordance with the Priority Schedule, wages including vacation withholding are credited first, followed by elective deferrals 401k contributions.

(b) In the event that an employer is delinquent in the remittance of all fringes, or has not remitted sufficient payment to cover 401k contributions, EISB will advance the payment, to the extent possible and upon timely receipt of the remittance report from the Employer.  Although twenty percent (20%) liquidated damages will be assessed on the delinquency, this will prevent EISB from having to report the delinquency on the annual Form 5500.

(c) If the delinquent Employer fails to timely provide EISB a copy of the remittance report, or if EISB determines it is financially not feasible to advance the payments, EISB will report such delinquency on the annual Form 5500 and notify the Employer of special disclosure rules and penalties that apply.  The DOL treats employee contributions as a loan from the Plan to the employer which is considered a prohibited transaction under The Employee Retirement Income Security Act (ERISA).

(d) In addition to billing the Employer for liquidated damages, EISB will compute each employees' "lost earnings" and "excise taxes" that will be imposed as a result of the delinquency and bill the Employer accordingly. Lost Earnings will be transmitted to the employees' individual accounts upon receipt from the Employer.

(e) Delinquent Employers will be notified that they have the option of making a filing under the DOL's Voluntary Fiduciary Correction (VFC) Program which will exempt the delinquency from the prohibited transaction rules including the excise taxes that will be imposed unless the delinquency exceeds one hundred and eighty(180) days.  The delinquency will not be reported as a prohibited transaction on Schedule G of Form 5500, it will be reported as a delinquent employee contributions on Schedule H of Form 5500.

(f) Upon notification that an Employer has chosen to make a VFC filing, EISB will waive the excise tax, unless the delinquency exceeds one hundred and eighty (180) days.

45

1
2
3
4
5
6
7
8

# Article VIII
## SEPARABILITY CLAUSE

Section 1. Should any provision of this Agreement be declared illegal by any court of competent jurisdiction, such provisions shall immediately become null and void, leaving the remainder of the Agreement in full force and effect and the parties shall, thereupon, seek to negotiate substitute provisions which are in conformity with the applicable laws.

46

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on this 18th day of June 2010

LOCAL UNION 6
INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS

SAN FRANCISCO ELECTRICAL
CONTRACTORS ASSN., INC.

JOHN J. O'ROURKE

THOMAS A. COLEMAN

TIMOTHY J. DONOVAN

LEONARD LYNCH

PHIL FARRELLY

JIM YOUNG

JOHN DOHERTY

ERNIE ULIBARRI

JOSE FUENTES ALMANZA

MICHAEL GARNER

DAN LONGENBAUGH

JASON MC CLEAN

47

# AGREEMENT ON EMPLOYEE PORTABILITY

## BETWEEN

## THE INTERNATIONAL BROTHERHOOD
## OF ELECTRICAL WORKERS

## AND THE

## NATIONAL ELECTRICAL
## CONTRACTORS ASSOCIATION

# AGREEMENT ON EMPLOYEE PORTABILITY

This revised agreement, between the International Brotherhood of Electrical Workers ("IBEW") and the National Electrical Contractors Association ("NECA"), shall become effective on January 1, 1997. This agreement shall apply throughout the United States, and, except as provided in paragraph 3, it shall supersede any inconsistent provisions of agreements between Local Unions of the IBEW and Chapters of NECA.

The IBEW and NECA agree as follows:

1. A contractor who is a member of NECA and who is bound by a collective bargaining agreement between one IBEW Local Union and a NECA Chapter may bring up to four bargaining unit employees employed in that Local Union's jurisdiction ("bargaining unit employees") into the jurisdiction of another IBEW Local Union, provided that the contractor is bound by a collective bargaining agreement with that other Local Union covering the work to be performed. No more than four bargaining unit employees may be employed at any one time under this paragraph in the jurisdiction of that other Local Union.

2. A contractor who is a member of NECA and who is bound by a collective bargaining agreement between one IBEW Local Union and a NECA chapter may bring up to two bargaining unit employees per job from that Local Union's jurisdiction into the jurisdiction of another IBEW Local Union to perform specialty work or service and maintenance work, provided that the contractor is bound by a collective bargaining agreement with that other Local Union covering the work to be performed.

3. Notwithstanding the provisions of paragraphs 1 and 2 of this agreement, a NECA Chapter and an IBEW Local Union may agree that a contractor may bring more bargaining unit employees than permitted by those paragraphs into that Local Union's jurisdiction, provided that the contractor meets all of the qualifications described in paragraphs 1 and 2 of this agreement.

4. A contractor bringing bargaining unit employees into a Local Union's jurisdiction pursuant to paragraphs 1 or 2 of this agreement will provide that Local Union, either before such employees begin working or on the first weekday on which such employees work, with the names and social security numbers of the employees and the location and identity of the job on which they will be or are working.

5. In all other respects, a contractor bringing employees into a Local Union's jurisdiction pursuant to paragraphs 1 or 2 of this agreement will comply with all of the terms of the collective bargaining agreement applicable to the work performed.

6.  In times of unemployment in the jurisdiction of a Local Union where the work is to be performed the traveling contractor shall be allowed to bring in the first two (2) bargaining unit employees. The next two (2) bargaining unit employees shall come from the Local Union where the work is to be performed. The next bargaining unit employee will be from the traveling Local Union, followed by the next bargaining unit employee from the Local Union where the work is performed. This system may continue until the traveling contractor has a total of no more than four (4) bargaining unit employees in the Local Union jurisdiction.

7.  Times of unemployment shall be defined as periods where unemployment exceeds 10% of the bargaining unit employees for a period of three (3) weeks in the Local Union in whose area the work is being performed. Those persons who are on Book 1 and are not available for employment within 48 hours of a request for bargaining unit employees shall not be considered as unemployed. Any questions or interpretations of what constitutes unemployment shall be referred to the IBEW International Vice President and the NECA Regional Director.

8.  The purpose of this agreement is to allow a traveling contractor to bring into another jurisdiction a limited number of bargaining unit employees already on the payroll who are knowledgeable of the contractor's work practices and the customer's requirements for start up and completion of the work to be performed. Any bargaining unit employee being assigned into the jurisdiction of another Local Union under this agreement must have been employed by the inside or outside traveling contractor for a period not less than two (2) weeks immediately prior to traveling to the job where the work is to be performed unless a lesser period is agreeable with the receiving Local Union.

9.  This agreement is intended to apply only to contractors who are members of NECA, and nothing herein is intended to limit or otherwise affect the right of the IBEW or its affiliated Local Unions to bargain with any other person, firm, corporation, or entity with regard to subjects similar or identical to those herein.

10.  This agreement will not apply to any work performed under the Joint National Agreement for Instrument Technicians, the Outside Utility Construction National Project Agreement, the National Teledata Agreement, or any International Specialty Agreement.

11.  This agreement will remain in effect from year to year. Either party may terminate this agreement by providing the other with written notice at least 180 days prior to the next anniversary date of this agreement.

Signed this 20th day of December, 1996.

For the International Brotherhood
of Electrical Workers

For the National Electrical
Contractors Association

J. J. Barry
International President

John M. Grau
Executive Vice President

2

EXHIBIT B

**LOCAL UNION 6**

*International Brotherhood of Electrical Workers*

55 FILLMORE STREET • SAN FRANCISCO, CA. 94117 • (415) 861-5752 • FAX (415) 861-0734

February 28, 2011

Shimmick Construction
8201 Edgewater Dr., Ste. 202
Oakland, CA 94621

To Whom It May Concern:

Our records indicate that our member, David McCarroll, has been employed by Shimmick Construction since June 2010. During that time he has worked outside of IBEW Local 6's jurisdiction. When employees travel outside the jurisdiction they receive Local 6 wages and fringes.

Article IV, Section 14 states:

When Employers send workmen to perform work outside the jurisdiction of the Union where a different wage rate prevails, they shall be paid the highest rate. When workmen are required to work in any jurisdiction that does not participate in the same employee plans as set forth in Article VI of this Agreement, the Employer shall comply with the requirement of Article VI.

Article IV, Section 15 states:

The employer shall furnish transportation during regular working hours to and from all jobs within the jurisdiction of the Union. On all work outside the jurisdiction of the Union, the Employer shall furnish transportation, board, room, and all other necessary expenses, including time traveling outside the regular working hours. Reasonable expense shall be allowed for overnight trips, with fifteen dollars ($15.00) per day per man for a seven (7) day week recognized as a minimum amount.

Transportation and travel time outside the workday, for all work outside the jurisdiction needs to be calculated and paid to this employee.

You may contact me at (415) 861-5752.

Very truly yours,

Timothy J. Donovan
Assistant Business Manager

Cc:    Tom Coleman, SFECA

TJD:jab OPE-3-AFL-CIO(37)

EXHIBIT C

**San Francisco Electrical Industry Labor Management Committee**

**Minutes of May 24, 2011**

A meeting of the Labor Management committee was called to order at 9am by Tom Coleman at 55 Fillmore St., San Francisco, CA.

The following were present:

Representing IBEW Local 6          Representing SFECA
John O'Rourke                      Tom Coleman
Tim Donovan                        Jason McClean

Mark Thomas was present and representing Shimmick Construction

Tim Donovan read the request for reimbursement of wages and expenses that occurred while traveling for the employer.

Testimonies were given by Tim Donovan and Mark Thomas.

Mark Thomas was adamant that the Project Labor Agreement for the S.F. Public Utilities Commission Water System Improvement Program (WSIP) allowed Shimmick construction to pay their employees a lower wage rate than required by the Inside Wiremen Collective Bargaining Agreement.

After hearing from both sides Mark Thomas was asked to leave and he would be noticed by the Committee.

The Committee reviewed the information presented and determined that the member was not paid properly and needed to be reimbursed for expenses that occurred while traveling for the employer.  Transportation was also to be included. *Wages and Transportation*

Tim Donovan was to figure out the totals and present them to SFECA for review.

A decision would then be made and sent to Shimmick Construction.

Respectively Submitted

*[signature]*

Timothy J. Donovan
Assistant Business Manager

TJD:rd/OPE-3-AFL-CIO(37)

EXHIBIT D

**San Francisco Electrical Industry Labor Management Committee**

Results of the Labor Management Hearing held on May 24,2011

The Committee reviewed the information presented and determined that the member was not paid properly and needed to be reimbursed for travel time, wages and expenses that occurred while traveling out of the jurisdiction for the employer. Mr. McCarroll worked in two different jurisdictions; From June 2010 through November 2010 he worked in Local 332 and from November 2010 to present he is working in Local 595.

Attached you will find a summary of expenses that need to be reimbursed.

Jason McClean
Assistant Manager
San Francisco Electrical Contractors Assn.

Tim Donovan
Assistant Business Manager Secretary
IBEW Local 6

| Local 595 January thru July | | | | | |
| --- | --- | --- | --- | --- | --- |
| Local 6 rate | | $53.05 | | | |
| Paid Amt - $50.06 | | $50.06 | | | |
| Difference Jan thru May - $2.99 | | $2.99 | June/July $2.42 | | |
| $2.99 x 732 hours = | | $2,188.88 | | | |
| $2.42 x 226 hours = | | $546.92 | | | |
| Total | | | | | $2,735.60 |
| | | | | | |
| **Expenses:** | | | | | |
| Local 595 12% deducted = | | $8,047.26 | (less 6% deposited) | | $4,023.63 |
| to be reimbursed 6% LU 595 dues = | | $4,023.63 | | | |
| member rcvd 6% LU 595 vacation = | | $4,023.63 | | | |
| | | | | | |
| **Travel:** | | | | | |
| Time - Local 595 November 2010 thru July 2011 = 158 days (237 hours) | | | | | |
| FM @ 43 hours x $59.68 = $2566.24 | | | | | |
| JW @ 194 hours x $53.05 = $10,291.70 | | | | | |
| 3/4 hour each direction = 1.5 hpd @ $53.05 (ST) x 158 days = | | | | $12,857.94 | |
| Mge -44 miles each dirctn x 2 x $0.51 pm x 158 days = | | | | $7,091.04 | |
| Total Time and Miles | | | | | $19,948.98 |
| | | | | | |
| | | | | | |
| Local 332 July 2010 thru November 2010 | | | | | |
| | | | | | |
| **Expenses:** | | | | | |
| Local 332 7% deducted = | | $2,137.89 | (less 1% refunded) | | $1,832.48 |
| to be reimbursed 4% mrkt recovery = | | $1,221.65 | | | |
| to be reimbursed 3% dues = | | $916.24 | | | |
| member received 1% of 7% | | -$305.41 | | | |
| | | | | | |
| **Travel:** | | | | | |
| Time - Local 332 July 2010 thru Nov 2010 = 55days (82.5 hrs) | | | | | |
| 3/4 hour each direction = 1.5 x $59.68 (straight time) x 55 days = | | | | $4,923.36 | |
| Mge -51 miles each dirctn x 2 x ($0.51 pm) x 55 days = | | | | $2,861.10 | |
| Total Time and Miles | | | | | $7,784.46 |
| | | | | | |
| | | | | | |
| Bridge Toll - $5.00 per day x 158 | | $790.00 | | | $790.00 |
| | | | | | |
| **Local 595 Wages** | | | | $2,735.60 | |
| | Time and Miles | | | $19,948.98 | |
| | Expenses | | | $4,023.63 | |
| Total | | | | $26,708.21 | |
| | | | | | |
| **Local 332 Time and Miles** | | | | $7,784.46 | |
| | Expenses | | | $1,832.48 | |
| Total | | | | $9,616.94 | |
| | | | | | |
| **Bridge** | | | | $790 | |
| | | | | $37,115.15 | |